David DeLAIRE

v.

Rick H. KASKEL, et al.

No. 2002–477–Appeal.

Supreme Court of Rhode Island.

Jan. 22, 2004.

Ronald J. Creamer, Esq., Wakefield, for Plaintiff.

Mark T. Reynolds, Esq., for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

PER CURIAM.

The plaintiff in this personal injury action, David DeLaire (DeLaire), appeals from the entry of summary judgment in favor of the defendants, Rick and Louise Kaskel (defendants). We directed both parties to appear and show cause why the issues raised in this appeal should not summarily be decided. No such cause having been shown, we proceed to decide the appeal at this time.

The facts of this case are not in dispute. The plaintiff, an animal-control officer for the Town of East Greenwich, was called to defendants' property on February 16, 2000, to remove a stray cat. The defendants had been attempting to remove this cat from their yard for the previous five months; DeLaire testified that he had visited the home on at least three separate occasions attempting to corral the animal. On the day in question, the defendants already had trapped the cat in a cardboard box at the time they called animal control. After plaintiff pulled into defendants' driveway and exited his van, he slipped and fell on a patch of snow, breaking his arm. DeLaire managed to get up from his fall and retrieve the cat from defendants, but sought medical attention later in the day.

On May 25, 2001, DeLaire filed suit in the Superior Court against defendants, alleging negligence and seeking compensatory damages for personal injury. The defendants moved for summary judgment, asserting that plaintiff's claim was precluded by the "public safety officer's rule" (the

rule). After a hearing, the trial justice granted defendants' motion and entered judgment in their favor.

The plaintiff argues on appeal that the trial justice erred in granting defendants' motion for summary judgment. He contends that the rule does not apply to the facts of this case because he is neither a police officer nor a firefighter. DeLaire also argues that the rule does not apply because as an animal-control officer, he was not responding to an emergency similar to a police officer or firefighter.

■ This Court undertakes *de novo* review of a trial justice's decision on a motion for summary judgment, applying the same standards to determine that motion as the trial court. *Sakonnet Point Marina Association v. Bluff Head Corp.*, 798 A.2d 439, 441 (R.I.2002). We will uphold a grant of summary judgment if, after reviewing the evidence in the light most favorable to the nonmoving party, no genuine issues of material fact are revealed, and the moving party is entitled to judgment as a matter of law. *Id.; J.R.P. Associates v. Bess Eaton Donut Flour Co.*, 685 A.2d 285, 286 (R.I.1996) (mem.).

In the current case, we are asked to determine whether an animal-control officer falls within the public safety officer rule. Despite the fact that the rule's broad name might suggest that an animal-control officer is included in its ambit, we have never expressly held that the rule applies to public employees other than police officers and firefighters. *See, e.g., Sobanski v. Donahue*, 792 A.2d 57, 60 (R.I. 2002) (barring police officer from suing landlord for injuries resulting from dog attack); *Krajewski v. Bourque*, 782 A.2d 650, 651 (R.I.2001) (per curiam) (barring

police officer's negligence claim after the officer slipped on icy driveway while investigating a damaged mailbox); *Martellucci v. Federal Deposit Insurance Corp.*, 748 A.2d 829, 832 (R.I.2000) (barring police officer from suing owner for negligent maintenance of parking lot); *Day v. Caslowitz*, 713 A.2d 758, 759 (R.I.1998) (barring police officer's claim resulting from a slip and fall); *Smith v. Tully*, 665 A.2d 1333, 1335–36 (R.I.1995) (barring police officer from suing owner of bar where police officer fatally shot bar patron in self-defense); *Aetna Casualty & Surety Co. v. Vierra*, 619 A.2d 436, 439 (R.I.1993) (holding firefighter's rule applied to police officers as well as firefighters); *Mignone v. Fieldcrest Mills*, 556 A.2d 35, 36 (R.I.1989) (barring firefighter who fell on water-soaked stairs from suing landowner); *Cook v. Demetrakas*, 108 R.I. 397, 398–99, 275 A.2d 919, 920–21 (1971) (directing a verdict for defendant landowner when police officer entered a defendant's premises to arrest larceny fugitive). Thus, we are presented with a question of first impression: does the rule apply to animal-control officers? Because we conclude as a matter of law that it does not, we reverse the trial justice's decision to grant summary judgment in favor of defendants.[1]

The public safety officer's rule derives from the common law "firefighter's rule," which historically precluded a firefighter from recovering from "one whose negligence causes or contributes to the fire that in turn causes injury or death to the firefighter." *Vierra*, 619 A.2d at 437 (quoting *Mignone*, 556 A.2d at 37). More recently, we have applied the rule to both police officers and firefighters, precluding them from suing private landowners for injuries suffered while confronting the normal,

---

**1.** We make this decision mindful of the fact that neither the majority nor the dissent has discovered a single case in any jurisdiction that classifies "animal-control officers" as falling within the ambit of the public safety officer's rule.

foreseeable risks inherent in their jobs. *Day,* 713 A.2d at 759. Because the rule operates as an exception to the general duty to exercise reasonable care to protect persons who may come upon one's property, we have previously approved its application in a limited set of circumstances. *See Labrie v. Pace Membership Warehouse, Inc.,* 678 A.2d 867, 870 (R.I.1996) (by construing the rule narrowly as an exception to the general duty to exercise reasonable care, we seek to avoid either abolishing the rule entirely or else creating numerous exceptions to it).

■ Our previous cases have identified two rationales to support the rule. *Mignone,* 556 A.2d at 38–39. The first is based upon the doctrine of primary assumption of risk. This doctrine holds that police officers and firefighters assume the normal, foreseeable risks inherent in their duties as public safety officers when they enter those professions. *Id.* at 39. Because their normal duties involve assisting people in dangerous situations, these officials assume those risks *as a matter of law. Id.* Accordingly, police officers and firefighters are precluded from suing private landowners to recover for injuries suffered from confronting those normal, foreseeable risks inherent in their chosen occupation.

The second rationale underlying the rule is one of "fundamental concepts of justice." *Vierra,* 619 A.2d at 438 (quoting *Mignone,* 556 A.2d at 39). Because the public compensates police officers and firefighters for confronting the dangerous situations they may face, this Court has reasoned that officials should not be allowed to seek compensation for the negligence that creates the need for their services in the first place. *Id.* (citing *Mignone,* 556 A.2d at 39). To rule otherwise would be to allow

police officers and firefighters a form of double compensation. The New Jersey Supreme Court has stated:

> "[A]s with the homeowner who hires a contractor to repair a weakened roof, the taxpayer who pays the fire and police departments to confront the risks occasioned by his own future acts of negligence does not expect to pay again when the officer is injured while exposed to those risks. Otherwise, individual citizens would compensate police officers twice: once for risking injury, once for sustaining it." *Berko v. Freda,* 93 N.J. 81, 459 A.2d 663, 666 (1983).

Our decision today turns on the fundamental concepts of fairness identified above. The defendants have argued that animal-control officers are sufficiently similar to police officers such that the rule should apply equally to both. To support their position, defendants point to the fact that as an animal-control officer, DeLaire drove a vehicle with police license plates, carried a police-issued firearm, was a police constable,[2] reported to a police sergeant, and used an office in the East Greenwich Police Department. Although these are valid considerations, they are not compelling for purposes of our present analysis. Instead, we are persuaded that the differences between the duties, training, benefits, compensation and statutory protections afforded Rhode Island police officers and firefighters, and the duties, training, benefits and compensation of a municipality's animal-control officer, are controlling.

Rhode Island police officers and firefighters receive the benefits of G.L.1956 § 45-19-1, the statute that provides that police officers and firefighters injured in the line of duty shall receive their full

---

**2.** Defense counsel admitted at oral argument that DeLaire's position as a police constable was independent from his employment as an animal-control officer.

salary, as well as medical and related expenses, from the respective city, town or fire district where they are employed. Section 45–19–1(a); *Labbadia v. State,* 513 A.2d 18, 21 (R.I.1986). Animal-control officers, however, do not enjoy these protections. Compensation for work-related injuries suffered by an animal-control officer is controlled by the Workers' Compensation Act. G.L.1956 § 28–29–2(4). Another difference concerns the training associated with these positions. Although police officers receive the benefit of instruction at a police academy, DeLaire testified that he did not graduate from a police training academy. Furthermore, although the same local chapter of the police union represents both East Greenwich police officers and animal-control officers as their collective bargaining agent, animal-control officers are considered *non-police members* of the union, and receive separate contracts. Additionally, police officers benefit from a significantly larger salary, pension and benefit program than animal-control officers. Finally, police officers are a statutorily protected class of employees in Rhode Island because they enjoy the protection of the Law Enforcement Officer's Bill of Rights pursuant to G.L. 1956 chapter 28.6 of title 42.

The distinctions identified above are commensurate with the different levels of responsibility assumed by police officers and firefighters compared with animal-control officers. Animal-control officers are relatively under-compensated when compared with their police and firefighting brethren; they do not receive the same compensation, training, and benefits, and do not enjoy the statutory protection of § 45–19–1 and chapter 28.6 of title 42. Accordingly, we see no reason why fundamental concepts of justice should preclude animal-control officers from seeking redress from private landowners when they are injured as the result of a landowner's ordinary negligence.

For the foregoing reasons, the trial justice's decision granting summary judgment in favor of the defendants is reversed. The judgment is vacated and the case is remanded to the Superior Court.

FLANDERS, Justice, dissenting.

In refusing to apply the public-safety officer's rule (the rule) to this plaintiff, the majority relies on his status as an animal-control officer, specifically pointing to his ineligibility to recover injured-on-duty (IOD) benefits, to the fact that he did not graduate from a police-training academy, and to his "relatively under-compensated" status as an animal-control officer when compared with his better-heeled police and firefighting brethren. But it seems to me that the job title and benefit package of the particular public-safety officer involved in responding to a homeowner's call for help—including whether he or she can recover IOD benefits (as opposed to workers'-compensation benefits) for any injuries he or she may suffer in the line of duty—should not be the controlling factors in deciding whether to apply the rule to this or any other public-safety officer. Nor should we look to whether the public-safety officer in question attended a police-training academy, enjoyed the protections of the Law Enforcement Officer's Bill of Rights, or received the same or similar salary, pension, and other benefits as other public-safety officers. Instead, we should analyze the underlying purposes of the rule and determine whether those purposes would be served by applying it to the facts of this case. Upon doing so, it becomes apparent that the rule should apply to this plaintiff, and thereby bar his tort claim against these homeowning defendants.

"The public-safety-officer's rule is an outgrowth of the common-law firefighter's rule that precluded suit against a party whose alleged negligence caused or contributed to the fire that injured or killed the firefighter." *Day v. Caslowitz*, 713 A.2d 758, 759 (R.I.1998). *See also Sobanski v. Donahue*, 792 A.2d 57, 59 (R.I.2002); *Labrie v. Pace Membership Warehouse, Inc.*, 678 A.2d 867, 868 (R.I.1996). This rule is "deeply rooted" in the common law and is based on two principal rationales: the primary-assumption-of-the-risk doctrine and the other fundamental public-policy considerations that argue against allowing such lawsuits to proceed, including the unfairness of permitting public-safety officers to recover damages for the very negligent acts that create the need for their employment in the first place. *Mignone v. Fieldcrest Mills*, 556 A.2d 35, 38–39 (R.I.1989). *See also Aetna Casualty & Surety Co. v. Vierra*, 619 A.2d 436, 438 (R.I.1993).

"[P]rimary assumption of the risk is assumption of the risk by operation of law." *Vierra*, 619 A.2d at 438.[3] It arises from the fact that public-safety officers, upon beginning and performing their job as government employees, are hired "for the specific purpose of having them assist people in dangerous situations." *Id.* Thus, by accepting such employment, they assume as a matter of law all the normal risks of incurring personal injuries that are inherent in performing their professional duties. *Mignone*, 556 A.2d at 39. By law, public-safety officers are deemed to assume such risks because the taxpaying public employs these officers to assist them in confronting dangerous situations and it compensates them to confront such risks. *Id.* Like their police and fire counterparts, animal-control officers are paid by the taxpaying public to confront the often dangerous situations that arise in the course of their work; for example, as in this case, when a wild or domestic animal needs to be caught or rescued. The fact that they may not receive as much compensation or benefits as a police officer or a firefighter is besides the point, which is that they are compensated at an appropriate level to confront the risks they face in controlling the town's animal population and in responding to taxpayers' calls for help in doing so. Nevertheless, public-safety officers are not required to assume every conceivable risk that they may encounter in their work; rather, they are deemed to assume only certain risks that are known or that they can reasonably anticipate they will encounter while doing their job. *Vierra*, 619 A.2d at 438. Significantly, the ordinary negligence of homeowners with respect to maintaining their property is one of those risks. *Id.*

Fundamental public-policy considerations also underlie the origin and continued applicability of the rule. *Mignone*, 556 A.2d at 39. This Court previously has indicated that " 'fundamental concepts of justice' " preclude public-safety officers from recovering in tort for injuries occasioned by a property owner's ordinary negligence. *Vierra*, 619 A.2d at 438. "Because the public employs, trains, and compensates public-safety officers" to encounter situations caused by the ordinary negligence of homeowners and others, it

---

**3.** "Primary assumption of the risk differs from 'secondary' assumption of the risk * * *." *Aetna Casualty & Surety Co. v. Vierra*, 619 A.2d 436, 438 (R.I.1993). The latter is an affirmative defense that individual defendants can assert to defeat liability even if the plaintiff has already established the defendant's liability. *Day v. Caslowitz*, 713 A.2d 758, 760 n. 2 (R.I.1998). To prevail, a defendant must show that a plaintiff knew of the specific danger in question, appreciated its unreasonable character, and voluntarily exposed himself to it. *Id.*

would be unfair "to allow such officers to recover for the very negligent acts that create the governmental need for their employment in the first place." *Day,* 713 A.2d at 760. To avoid this unfairness, the rule prevents these officers from effectively recovering double compensation for the work they do; that is, the rule eliminates the risk that the public will initially compensate public-safety officers in the form of salary and other employment-related benefits for braving dangerous situations and for encountering the risk of personal injury that such situations present, and thereafter allowing these same officers to receive additional compensation in the form of tort damages when they suffer injuries from the very same dangerous situations caused by negligent homeowners that they are compensated to encounter. *Id. See also Vierra,* 619 A.2d at 438. The rule, therefore, furthers the public policy of disallowing public-safety officers from effectively recovering twice for the very conduct that creates the need for their employment. *See Mignone,* 556 A.2d at 39.

The rule also furthers the public policy of encouraging homeowners and other taxpayers to freely solicit assistance from public-safety officers, without fear that they will be sued by such officers if they injure themselves on the taxpayer's property. *See Day,* 713 A.2d at 761. Narrowing the scope of the rule—as the majority does in this case—because the public-safety officer in question is not technically considered a true police officer and, therefore, does not receive the exact same salary and benefit package as a genuine police officer would receive (for example, he can recover only workers' compensation benefits but not injured-on-duty benefits), will have the unfortunate effect of deterring taxpayers in need of their assistance from summoning public-safety officers to their homes. As a result of this decision, home-owners now have to fear facing tort lawsuits or increased insurance premiums if the wrong type of public-safety officer responds to their call for help (that is, one who, unbeknownst to the taxpayer requesting help, might not be eligible to obtain IOD benefits). *See Lanza v. Polanin,* 581 So.2d 130, 132 (Fla.1991).

Indeed, for the purpose of applying the public-safety officer's rule, why should it matter whether an animal-control officer, a firefighter, or a police officer responds to the homeowner's call for help? From the homeowner's standpoint, he or she just wants a public-safety officer to lend a hand with an immediate problem involving some animal. For example, in *Sobanski,* 792 A.2d at 60, a police officer responded to a property owner's call for help about a stray dog that had attacked a neighbor. After the dog bit the responding officer, he tried to sue the homeowner, alleging negligence in allowing the dog to escape. *Id.* at 58. But this Court applied the rule and barred the officer's lawsuit. *Id.* at 60. In this case, however, the majority allows the public-safety officer to sue because he is an animal-control officer, not a policeman. But why should a police officer be barred from suing the allegedly negligent property owner but not an animal-control officer? And why should the result in *Sobanski* be different depending on whether a police officer, a firefighter, or an animal-control officer responded to the homeowner's call for help? Because injured police officers and firefighters can collect IOD benefits but an injured animal-control officer can only receive workers' compensation benefits? Because the police officer went to some police-training academy but the animal-control officer did not? Because the police officer is protected by the Law Enforcement Officer's Bill of Rights but not the animal-control officer?

None of these justifications for excluding the animal-control officer from the rule, I would submit, have anything whatsoever to do with its rationale. Although there are certainly distinctions between these two types of public-safety officers (just as there are distinctions between police officers and firefighters), they provide no basis or justification for treating them any differently under the rule. Indeed, to this justice, there is no justification or justice in countenancing such different results depending on which type of public-safety officer responds to the homeowner's call for help. Thus, it makes no sense at all to me to bar police officers and firefighters from suing homeowners in these same situations while allowing animal-control officers to do so.

■ To date, this Court has not hesitated when it was asked to extend the common-law "firefighter's rule" from just firefighters—to whom the courts first applied the rule—to cover police officers as well. *See Vierra*, 619 A.2d at 439. Thus, in *Vierra*, 619 A.2d at 439, we affirmed that the two principal rationales underlying the firefighters' rule argued in favor of extending its scope beyond just firefighters to include police officers. Acknowledging the primary-assumption-of-the-risk doctrine, we reasoned that police officers, like firefighters, assumed all the normal risks inherent in performing their professional duties. *Id.* Similarly, we noted that other public-policy considerations also weighed in favor of extending the rule to the police because these public-safety officers, like firefighters, receive their salaries from the taxes paid by local property owners. *Id.* Moreover, applying the rule to police officers as well as to firefighters also would prevent these public-safety officers from unfairly recovering twice for the taxpayers' alleged negligent conduct that created

the very need for their employment in the first place. *Id.* at 438.

In my judgment, these same reasons justify applying the rule to animal-control officers as well. They, too, assume all the normal risks inherent in performing their professional duties. Moreover, they, too, are paid by the local taxpayers to confront the public-safety risks and sometimes dangerous situations caused by stray animals and other animal-related problems that arise in our various communities. The fact that they might not receive as much compensation as a police officer or a firefighter may reflect, at least in part, the reduced level of risk they typically confront, but it does not change the fact that they nevertheless confront risks, are paid by the public to confront these risks, and respond to emergency calls for help. Consequently, they, too, should be barred from recovering for the alleged negligent conduct of homeowners and other taxpayers that creates or contributes to the need for their employment in the first place.

Based on this reasoning, courts in other jurisdictions have extended the rule from police and fire department employees to emergency medical personnel. *See generally*, Joseph B. Conder, *Application of "Firemen's Rule" to Bar Recovery by Emergency Medical Personnel Injured in Responding to, or at Scene of, Emergency*, 89 A.L.R.4th 1079, 1083 § 3 (1991). As in our *Vierra* opinion, these courts based their decisions on the primary-assumption-of-the-risk doctrine, citing the same public policy considerations that underlie that rule. *See Melton v. Crane Rental Co.*, 742 A.2d 875, 876 (D.C.1999); *Siligato v. Hiles*, 236 N.J.Super. 64, 563 A.2d 1172, 1173 (Ct.Law Div.1989); *Maltman v. Sauer*, 84 Wash.2d 975, 530 P.2d 254, 257 (1975). These precedents from other jurisdictions represent a judicial trend of abandoning a strictly defined or job-title oriented public-

safety officers rule in favor of a more broad professional rescuer doctrine, which may include occupations other than police officers or firefighters, and an analysis in each case to determine whether the particular professional injured in a rescue assumed the particular type of risk that led to the injury. Conder, 89 A.L.R.4th § 2[a] at 1082; *but see id.* § 4 at 1084–85 (collecting cases refusing to extend the rule to emergency medical personnel).

Consistent with our *Vierra* analysis and with those decisions from other jurisdictions extending the rule to other public-safety professionals besides firefighters and police officers, I believe that we should apply the rule to this animal-control officer and to other public-safety officers similarly situated, regardless of their specific title or job classification and irrespective of whether they are eligible for IOD benefits or just workers' compensation. Applying the primary-assumption-of-the-risk doctrine, we should deem this animal-control officer as having assumed the risk when he accepted his job of suffering personal injuries caused by a property owner's alleged ordinary negligence when the homeowner summons a public-safety authority for help in picking up a stray animal from their premises—regardless of which branch of government service or what type of public-safety officer actually responds to the call. Certainly, slipping on ice or snow in defendants' driveway was one of the risks inherent in plaintiff's performance of his duty to pick up stray animals in the community. *Cf. Day,* 713 A.2d at 761 (police officer who slipped on ice while investigating an activated alarm held barred from suing the property owners for alleged negligence). Just as the risk of a dog-bite injury was one that the public-safety officer assumed in the *Sobanski* case, so, too, a risk of slipping on snow or ice was a foreseeable risk and not an unexpected outcome of plaintiff performing his animal-control

duties in these circumstances. As we said in *Day,* 713 A.2d at 761, "[t]raversing accumulations of snow and ice on walkways and driveways is one of the risks inherent in a public-safety officer's normal performance of his or her job in this state during the winter months." Thus, even if plaintiff did not have actual knowledge of this very condition on defendants' property, he should have reasonably anticipated such a risk. In any event, he was paid to confront that risk; he can recover workers' compensation for any resulting incapacity to work; and, thus, he should not be allowed to recover further compensatory damages from homeowners and their insurers under these circumstances.

Citing *Labrie,* plaintiff argues that the public-safety officer's rule should not extend to him because animal-control officers "do not respond to the same level [of] emergencies as police officers or firefighters." In many situations, that may well be true. Indeed, that consideration doubtless explains, at least in part, why their level of compensation and benefits may be less than other public-safety officers, such as the police and firefighters. But these officers still respond to emergency situations and assume the risk of suffering personal injuries in their work. Thus, as in *Sobanski* and this case, wild animals, vicious dogs, and stray cats stuck in cardboard boxes, trees, or tangled in power lines can and do present circumstances involving a heightened risk of the responding public-safety officer suffering personal injuries—especially because such situations typically require immediate professional help of the kind that the taxpaying public paid this animal-control officer to provide. *Sobanski,* 792 A.2d at 59 (holding that the rule barred a police officer, who was bitten by a stray dog during an investigation of same, from suing the allegedly negligent homeowner for allowing the dog to escape).

The plaintiff correctly notes that, in *Labrie*, 678 A.2d at 871, we said that an underlying rationale for the rule was "the sudden and unexpected nature of the emergency service typically provided" by public-safety officers. We explained that it is unreasonable to expect property owners to exercise reasonable care in preparing for the sudden and unforeseeable entrance of these safety officers when they are responding to emergency situations. *Id.* "Absent * * * emergency conditions," we concluded, "the rule should not be applicable to bar negligence actions against tortfeasors." *Id.* at 872.

By relying on *Labrie*, however, plaintiff minimizes not only the often substantial risks inherent in performing the usual duties of an animal-control officer, but also the time-sensitive nature of the conditions under which such services usually are requested and delivered. Like other types of public-safety officers, animal-control officers' professional duties often require them to respond quickly to a host of time-sensitive situations involving animals in the town—a certain number of which inevitably will involve truly dangerous emergencies—at least to the homeowners and the other taxpayers requesting such help.

In that regard, it is of more than passing significance to note that this animal-control officer not only dressed like a policeman, worked out of an office in the police station, and drove a police van with police lettering stenciled on the side, but also was vested with arrest powers, carried a firearm, and wore a constable's badge. If his job did not involve some measure of risky business and encountering potentially dangerous conditions, why would he need these police-officer accoutrements to perform his duties as an animal-control officer? Thus, even if he was not formally designated as a police officer in some collective-bargaining agreement, for all intents and purposes, he held himself out to the public as not only a mere member of the police department, as that term was used in *Sobanski*, 792 A.2d at 59 (holding that the rule bars "members of the state's police and fire departments" from bringing tort actions), but also as an actual police officer. As such, he should be estopped by his conduct from asserting that the rule does not apply to him.

In any event, when plaintiff was summoned to defendants' home to pick up this stray cat, where it allegedly was trapped in a cardboard box, he knowingly risked encountering various dangers that were inherent in doing so, including the fact that the property in question might not have been cleared of ice and snow or otherwise maintained in as safe a condition as he would have preferred. *Compare Labrie*, 678 A.2d at 871 (describing risk or injury during a prearranged inspection of premises as "remote") *with Day*, 713 A.2d at 761–62 (holding that the risk of injury arising from traversing a snow-covered walkway at a potential crime scene is incidental to and inherent in the performance of a public-safety officer's normal duties). Unlike the fire-department employee in *Labrie*, who arrived on the scene in a shirt and tie at a prearranged appointed time to certify what he anticipated would be a properly functioning fire-alarm and sprinkler system, *id.*, this plaintiff responded to a call for help about a potentially dangerous situation. Thus, upon arriving at the scene, the plaintiff did not know whether the trapped stray cat in question would be rabid, wild, or violent. Although plaintiff correctly notes that the incident turned out to be fairly routine (except for his fall on the ice), it is the risk of *potential* danger, not a *post hoc* assessment of the actual danger arising from each particular situation involving a public-safety officer's hieing to the scene, that determines the application of the public-safety officer's rule.

*See Day,* 713 A.2d at 762 ("public-safety officers should be held to take the premises as they find them and assume all the usual risks inherent in performing their duties while they are investigating *potential* emergencies"). (Emphasis added.) Otherwise, any public-safety officer could skirt the rule by pointing out that a given summons for help that could have been fraught with danger turned out—after the fact—to be a relatively uneventful incident, except for the injuries he or she suffered.

In *Labrie,* because the risk of danger was so remote—the fire-department employee arrived on the scene in a shirt and tie to perform a routine inspection by a prearranged appointment—we declined to apply the public-safety officer's rule. *Labrie,* 678 A.2d at 871. Conversely, in responding forthwith to a call to remove a trapped stray cat from the premises of a property owner, this plaintiff faced significant risks, as evidenced by his arriving on defendants' property wearing a police uniform, carrying a firearm, driving an automobile with police license plates and lettering, and possessing arrest powers. In short, unlike *Labrie,* this case is not one that is "devoid of the usual exigencies that are present when a public-safety officer hies to the scene of a crime, a fire, or some other crisis." *Id.* at 869. Thus, the factual distinctions between this case and *Labrie* warrant applying the public-safety officer's rule to animal-control officers acting in circumstances similar to what this plaintiff encountered.

In addition to the primary-assumption-of-the-risk doctrine, other public-policy considerations also weigh in favor of applying the public-safety officer's rule to this plaintiff. As is true for other types of public-safety officers, the public paid plaintiff's salary and provided him with various benefits, including workers' compensation, for performing his services as an animal-control officer. As our case law has often stated, it is against public policy to compensate public-safety officers twice for encountering the usual risks of personal injury that are inherent in performing their professional duties. *Day,* 713 A.2d at 760; *Mignone,* 556 A.2d at 39.

Nevertheless, even though plaintiff's job duties contemplated that he would face potentially dangerous situations when confronting various types of fauna and domesticated wildlife at large in the town, the majority opinion permits plaintiff to recover twice for his injuries: he can initially recover his salary and benefits for risking these and other injuries that are the usual grist for public-safety officers called to a taxpayer's residence; then he can recover workers' compensation benefits; and now he also can recover tort damages against homeowners and their insurers for suffering such foreseeable injuries. *See Vierra,* 619 A.2d at 438. By allowing this plaintiff to recover tort damages in addition to his normal salary and workers' compensation benefits, the decision in this case undermines this public policy against awarding public-safety officers double compensation. *See Day,* 713 A.2d at 760.

In addition, by refusing to apply the public-safety officer's rule, the majority risks discouraging homeowners and other taxpayers from soliciting the assistance of public-safety officers because now they will have to worry about tort liability and increased insurance premiums if the responding officer turns out not to be a bona fide police officer or firefighter, as in *Sobanski* and *Day,* but the officer nevertheless injures himself or herself on their property. *See Lanza,* 581 So.2d at 132.

As the motion justice noted, when the plaintiff responded to defendants' request to pick up their stray cat, it may have been a routine call or an emergency situation. If this had in fact been a true emergency—involving, for example, a rabid, infected, or a violent stray cat—then

the defendants clearly would have required plaintiff's professional expertise in handling this animal. Public-policy considerations, therefore, should encourage citizens to seek assistance from animal-control officers in dealing with potentially dangerous animals. But this decision, regrettably, represents an unfortunate setback to that worthy goal. After all, the "rule only seeks to eliminate the injustice which arises when an officer sues the individual whose conduct gave rise to the very need for his or her services." *Vierra*, 619 A.2d at 440. In this case, however, that injustice is not eliminated but perpetuated because the majority allows the public-safety officer to sue the individual whose conduct gave rise to the very need for his services.

The lesson here for homeowners? Ask for a genuine police officer or firefighter when calling for help. Do not just call the police dispatcher, ask for help, and hope for the best. And if what looks like a police officer arrives, bar him or her from the premises until you can ascertain whether he or she is able to collect IOD benefits, went to the police-training academy, and can take advantage of the Law Enforcement Officer's Bill of Rights. Do not be fooled by the police uniform, the police lettering on the van, the badge, or the gun. They are not enough to protect you! Better you should call again for a real police officer or firefighter than just settle for someone who merely looks, acts, walks, and talks like one but who, in the final analysis, may not be eligible to collect IOD benefits, only workers' compensation.

For these reasons, I respectfully dissent and would affirm the motion justice's entry of a summary judgment in favor of the defendants.